# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>               Respondent,<br><br>           v.<br><br>RICARDO MIRELES, JR.,<br><br>               Appellant. | No. 79923-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

APPELWICK, J. — Mireles appeals his conviction for cyberstalking. He argues that the statute under which he was convicted is unconstitutional because it is facially overbroad. He further argues that the prosecutor committed flagrant and ill-intentioned misconduct at trial. In the alternative, he argues that counsel was deficient for failing to object to the prosecutor's misconduct. In a statement of additional grounds, he challenges sufficiency of the evidence and alleges prosecutorial misconduct in charging decisions. The statute is overbroad but its constitutionality can be preserved with a sufficiently limiting construction. Mireles's arguments are otherwise without merit. We affirm.

## FACTS

Ricardo Mireles, Jr. and the victim in this case dated for about four months after meeting online in October 2017. The victim described Mireles as warm, friendly, and attentive during the first few weeks of their relationship. But, later in the relationship, he was physically intimidating.

Citations and pin cites are based on the Westlaw online version of the cited material.

In one instance, Mireles became violent with the victim during an argument arising from her reluctance to engage in a particular sex act. She tried to explain but Mireles did not want to talk about it because it involved her ex-husband. Mireles became angry at the mention of the victim's ex-husband. He screamed at her to leave his apartment. But, he then prevented her from leaving by blocking her path and throwing her belongings all over the apartment. He cornered her against the wall, screamed at her inches away from her face, hit himself in the face and chest, and hit doors in the bathroom and bedroom with a closed fist, leaving multiple holes in them.[1]

The victim testified that she felt afraid, helpless, and unsure during the incident. She said that she thought that if she tried to leave, Mireles would become physical with her. Mireles, who had consumed a bottle of wine prior to this incident, later apologized and claimed to have a drinking problem. He told her that he would not drink anymore. They continued to date after the incident. By March 10, 2018, though, they had ended their relationship.

On March 10, 2018, the victim was out to dinner with a longtime friend. That evening, she began to receive text messages from Mireles. The messages continued for roughly 24 hours. In the messages, Mireles threatens violence, tells her he is waiting at her home, threatens to "ruin her job" by sharing messages with

---

[1] Mireles denied all of this at trial. Instead, he claimed that the victim began talking about her ex-husband, which upset him. So, he claims he asked her to leave and waited in his room until she did so.

co-workers, makes demeaning comments about having anal sex with her, threatens to kill her, and threatens to kill himself. A corresponding call log shows a four second call from the victim's phone to Mireles's the next day. After the call, the next text message in the text thread received by the victim was Mireles asking, "You called?"

The victim was afraid to return to her house after receiving the messages. She instead went home with her dinner companion and stayed there for several hours. When she returned to her house, she asked strangers she encountered near her home to wait for her while she checked the home to ensure it was safe.

The following day, the victim called a domestic violence help line. Later that same day, she went to the Seattle Police Department (SPD) in West Seattle to report Mireles to police. She showed the text messages to the police officer on duty, who included some of them in his report of the incident.

Detective Rande Christiansen took over the investigation on March 13, 2018. He called the victim that same day. After the call, the victim e-mailed him screenshots of the messages. He twice spoke to Mireles, who denied having sent the messages. Both calls were recorded. Several weeks after sending screenshots of the messages to Christiansen, the victim deleted the messages from her phone.[2]

---

[2] When the State later requested the victim's Internet backup from the cell phone manufacturer, the messages were not there. Detective Chris Hansen, a forensics expert for the State, testified that deleting text messages from a phone would eventually cause the messages to be deleted from the backup as well.

The State charged Mireles with felony harassment-domestic violence. It later amended the information to add a felony cyberstalking charge.

Prior to trial, Mireles moved to dismiss the cyberstalking charge arguing the statute was unconstitutionally overbroad. The trial court denied the motion.

During motions in limine, the State sought to introduce the prior violent incident between Mireles and the victim. Mireles objected that the testimony would be overly prejudicial, especially testimony that the argument followed a disagreement about whether to engage in a particular sex act. The trial court allowed testimony that the incident occurred so long as there would be no testimony that the argument occurred as a result of a disagreement about engaging in a sex act. When describing the incident at trial, the victim said the argument occurred because "[Mireles] wanted me to do something I wasn't comfortable doing" and that her reasons for discomfort "involved [her] ex-husband." Mireles did not object to this testimony.

Also during trial, the State sought to elicit testimony from the victim relating to the personal hardship associated with going to trial. Mireles objected to this testimony, but did not move to strike answers the victim had already given. The trial court ruled this was not relevant. At closing, the State still referenced the hardships the victim endured related to trial.

At closing, the State analogized the behavior demonstrated by the text messages with Mireles's behavior during the earlier altercation between him and

4

the victim.  And, in response to cross-examination questioning the adequacy of the investigation, the prosecutor argued that the SPD had limited resources with which to conduct an investigation, but that this should not prevent the jury from finding Mireles guilty.  Mireles did not object to any of these arguments.

The jury found Mireles guilty as charged.

Mireles appeals.

DISCUSSION

Mireles makes six arguments.  First, he argues that the cyberstalking statute under which the State charged him is constitutionally overbroad.  Second, he argues that he was denied a fair trial due to flagrant and ill-intentioned prosecutorial misconduct.  Third, he argues his counsel was ineffective for failing to object to flagrant and ill-intentioned misconduct by the prosecutor.  Fourth, in a statement of additional grounds, he argues that the State presented insufficient evidence to support his conviction.  Fifth, also in a statement of additional grounds, he argues various additional instances of prosecutorial misconduct during the investigation and plea negotiations.  Last, he argues that cumulative error deprived him of a fair trial.

I.  <u>Constitutionality of RCW 9.61.260</u>

Mireles argues first that the cyberstalking statute under which he was convicted, RCW 9.61.260, is unconstitutional.  He argues both that the statute is unconstitutional because it is facially overbroad and facially invalid.

5

The right to free speech is protected by both the federal and Washington constitutions. WASH. CONST. art. I, § 5; U.S. CONST. amend. I. Overbreadth analysis under article I, section 5 of the Washington Constitution follows that of the First Amendment of the federal constitution. State v. Immelt, 173 Wn.2d 1, 6, 267 P.3d 305 (2011). A statute is overbroad under the Washington and federal constitutions if it prohibits a substantial amount of protected speech. City v. Willis, 186 Wn.2d 210, 220, 375 P.3d 1056 (2016). Where, as here, a litigant brings a facial overbreadth challenge, their standing does not depend on whether their own conduct is constitutionally protected. Id. For the purpose of determining whether RCW 9.61.260 is unconstitutionally overbroad, Mireles's actual conduct is irrelevant. Id. The constitutionality of statutes is an issue of law we review de novo. Immelt, 173 Wn.2d at 6.

In determining whether a statute is overbroad, the court's first task is determining whether the statute reaches a substantial amount of constitutionally protected conduct. City of Seattle v. Huff, 111 Wn.2d 923, 925, 767 P.2d 572 (1989). If so, the court must then determine if the constitution allows the regulation of the protected speech. Id. at 926. The standard for whether a regulation on protected speech is constitutional depends on the forum being regulated. See id. Speech in public forums is subject to valid time, place, and manner restrictions which are "'content-neutral, and narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" Id.

6

(quoting Bering v. Share, 106 Wn.2d 212, 222, 721 P.2d 918 (1986)). Regulations on speech in nonpublic forums are reviewed under a less stringent standard. See id. Speech in nonpublic forums may be restricted if the "'distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint-neutral.'" Id. (quoting Seattle v. Eze, 111 Wn.2d 22, 32, 759 P.2d 366 (1988)). Finally, even if a statute impermissibly regulates a substantial amount of protected speech, it will be overturned only if the court is unable to place a sufficiently limiting construction on the statute. City of Tacoma v. Luvene, 118 Wn.2d 826, 840, 827 P.2d 1374 (1992).

RCW 9.61.260 provides, in pertinent part,

(1)     A person is guilty of cyberstalking if he or she, with intent to harass, intimidate, torment, or embarrass any other person, and under circumstances not constituting telephonic harassment, makes an electronic communication to such other person or a third party:

(a)     Using any lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act;

(b)     Anonymously or repeatedly whether or not conversation occurs; or

(c)     Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.

. . . .

(5) For the purposes of this section "electronic communication" means the transmission of information by wire, radio, optical cable, electromagnetic, or other similar means. "Electronic communication" includes, but is not limited to, electronic

7

mail, internet-based communications, pager service, and electronic text messaging.

The language of the statute mirrors the telephonic harassment statute, which reads,

(1)     Every person who, with intent to harass, intimidate, torment, or embarrass any other person, shall make a telephone call to such other person:

(a)     Using any lewd, lascivious, profane, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act; or

(b)     Anonymously or repeatedly whether or not conversation occurs; or

(c)     Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.

RCW 9.61.230.    The telephonic harassment statute has been upheld as constitutional on numerous occasions.  State v. Dyson, 74 Wn. App. 237, 239, 872 P.2d 1115 (1994); State v. Alexander, 76 Wn. App. 830, 832, 888 P.2d 175 (1995); State v. Alphonse, 147 Wn. App. 891, 906, 197 P.3d 1211 (2008).

First, in Huff, our Supreme Court held that language identical to the telephonic harassment statute language in a City of Seattle telephonic harassment ordinance was constitutional in the face of an overbreadth challenge.  111 Wn.2d at 924, 928.  The Huff court found that the ordinance at issue there proscribed a substantial amount of protected speech.  Id. at 925-26.  But, it found that telephonic communications were a nonpublic forum, and upheld the restrictions as reasonable.  Id. at 927-28.

8

Later, in Dyson, this court held that the language of RCW 9.61.230(1) was not constitutionally overbroad. 74 Wn. App. at 245. It found that "making telephone calls with the intent to harass, intimidate, or torment another while using lewd, lascivious, profane, indecent, or obscene words or language, or suggesting the commission of any lewd or lascivious act" was conduct implicating speech, rather than speech itself. Id. at 243 (citing State v. Talley, 122 Wn.2d 192, 210, 858 P.2d 217 (1993)). Because the statute required a specific intent, it found that the impact on speech was insubstantial. Id.

The cyberstalking statute criminalizes private electronic communications within its scope in the same manner that the telephonic harassment statute criminalizes private communication within its scope. The standard of review for private forum regulation is the same for the telephonic harassment statute and the cyberstalking statute.[3] For the same reasons Huff upheld the telephonic harassment statute, we find the cyberstalking statute applied to the private forum to be constitutional.

However, the telephonic harassment cases did not address the validity of the regulation of speech in public forums. And, the potential reach of the

---

[3] Mireles argues that a significant difference between the telephonic and cyberstalking statutes is that the cyberstalking statute criminalizes speech made to persons other than the victim. RCW 9.61.260(1). But, even speech made to a person other than the victim must still be made with intent to harm the victim. RCW 9.61.260(1). The Supreme Court has previously recognized that harassment to a victim can occur by communicating with a person other than the victim. State v. J.M., 144 Wn.2d 472, 488, 28 P.3d 720 (2001). The intent requirements in the

cyberstalking statute into these forums is significant. The internet, social media, and the like "for many are the principal sources for knowing current events, checking ads for employment . . . and otherwise exploring the vast realms of human thought and knowledge." Packingham v. North Carolina, __ U.S. __, 137 S. Ct. 1730, 1737, 198 L.Ed.2d 273 (2017). In many ways, the internet has become the "modern public square." Id.

But, even the modern public square is not beyond the authority of the government to regulate. Regulations in a public forum are permissible if they are content neutral, serve a compelling government interest, are narrowly tailored, and leave open ample alternative channels of communication.[4] Bering v. SHARE, 106 Wn.2d 212, 234, 721 P.2d 918 (1986).

RCW 9.61.260 regulates speech in the public forum because it criminalizes "electronic communications," which includes internet based communications made "with intent to harass, intimidate, torment, or embarrass." In Dyson we evaluated a similar statute in a private forum. 74 Wn. App 237. We determined that "making telephone calls with the intent to harass, intimidate, or torment another while using

cyberstalking statute sufficiently limit the extent to which communications to third parties may be prosecuted under the statute.

[4] Our Supreme Court has adopted a more stringent standard for speech regulations under the Washington Constitution than its federal counterpart. Bering, 106 Wn.2d at 234. To pass muster under the Washington Constitution, a time, place, and manner restriction must serve a compelling government interest, rather than a significant one. Id. at 222, 234. Because Mireles brings challenges under both the Washington and Federal constitutions, we apply the more stringent standard here.

lewd, lascivious, profane, indecent, or obscene words or language, or suggesting the commission of any lewd or lascivious act" was conduct implicating speech, rather than speech itself. 74 Wn. App. at 243. Because the statute required a specific intent, we concluded that the impact on speech was insubstantial. Id. Therefore, the statute was not overbroad.

We did so in reliance on Talley, which had considered an overbreadth challenge to the malicious harassment statute under public forum standards. Id. (citing Talley, 122 Wn.2d at 198, 210). There, the Supreme Court considered language that criminalized certain speech made with intent to harass, that mirrors the operative language here. Talley, 122 Wn.2d at 198, 202. It noted specifically that "a person is free . . . to make his or her odious or bigoted thoughts known to the world so long as those words do not cross the boundary into criminal harassment." Id. at 211. Such criminal harassment, the court noted, was conduct, not speech. Id. at 210-11.

In Virginia v. Black, 538 U.S. 343, 362, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), the Supreme Court reached a similar conclusion. It upheld a Virginia law banning cross burning on another's property or any public place "with 'an intent to intimidate.'" Id. at 348, 362. It held that a mens rea of evil intent rendered otherwise protected speech unprotected by the First Amendment. See id. at 362, 365 (cross burning may be proscribed with intent to intimidate, but cross burning without additional proof of the requisite intent may not).

11

We conclude that the intent requirement of the cyberstalking statute sufficiently limits the statutes reach to conduct. It punishes not the content of speech, but rather the selection of a victim and directing the speech in such a way as to cause a specific harm to them. See Talley 122 Wn.2d at 205-06. Under these cases, the harm from harassment and intimidation have been significant enough harm to warrant government regulation. See id. at 210-11; Black, 538 U.S. at 362; Dyson, 74 Wn. App. at 244 (prohibiting harassment is not prohibiting speech). While none of the cases specifically considered the "intent to torment" in their overbreadth analysis, the outcome would be the same. The intent is the same. The selection of the victim is the same. The harm is at least as great as that of harassment or intimidation.[5]

However, the same cannot be said for speech made with intent to embarrass.[6] It may be said that preventing "embarrassment" is a reasonable restriction in light of the purposes of a private forum like the telephone. See Alexander, 76 Wn. App. at 838-39. But, the Supreme Court has made clear that

---

[5] These words are not defined in the statute and so take their ordinary meanings. RCW 9.61.260; see also Gorre v. City of Tacoma, 184 Wn.2d 30, 37, 357 P.3d 625 (2015) (dictionary an appropriate source to determine plain meaning). Webster's defines "torment" as "severe suffering of the body or mind." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2412 (2002). It defines "intimidate" as "to make timid or fearful." Id. at 1184. It defines "harass" as "to vex, trouble, or annoy continually or chronically." Id. at 1031. Tormenting appears to be more severe conduct than intimidating or harassing.

[6] Webster's defines "embarrass" as "to place in doubt, perplexity or difficulties" or "to cause to experience a state of self-conscious distress." Id. at 739.

"speech does not lose its protected character . . . simply because it embarrasses others." Nat'l Assoc. for the Advancement of Colored People v. Claiborne Hardware Co., 458 U.S. 886, 910, 102 S. Ct. 3409, 73 L. Ed. 1215 (1982). We hold that the cyber stalking statute's criminalization of speech made with the intent to "embarrass" sweeps a substantial amount of protected speech within reach of the statute.

But, that is not the end of our inquiry. We will not invalidate an overbroad statute if we are able to place a sufficiently limiting construction upon the legislation. Luvene, 118 Wn.2d at 840. Here, the statute's constitutionality may be preserved if we strike the term "embarrass."

In determining whether an unconstitutional provision can be severed from a statute, we consider

> "whether the constitutional and unconstitutional provisions are so connected . . . that it could not be believed that the legislature would have passed one without the other, or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature."

State v. Abrams, 163 Wn.2d 277, 285-86, 178 P.2d 1021 (2008) (alteration in original) (quoting Gerberding v. Munro, 134 Wn.2d 188, 197, 949 P.2d 1366 (1998)).

Laws of 2004, chapter 94, the source of RCW 9.61.260 (§ 1), also contains a severability clause (§ 6). The presence of a severability clause offers necessary assurance that the legislature would have enacted the remaining provisions of the

act without the unconstitutional provisions. State v. Anderson, 81 Wn.2d 234, 236, 501 P.2d 184 (1972). And, the term "embarrass" is not so intimately connected with the balance of the act that its removal frustrates the act's legislative purpose. The cyberstalking statute can still be used to prosecute those who utilize electronic communications to inflict harm upon their victims.[7]

We strike the term "embarrass" from RCW 9.61.260. We conclude this is a sufficient limiting construction to eliminate the identified overbreadth of the statute as enacted. With the limitations imposed by the required intent to harass, intimidate, or torment, the statute does not deter a substantial amount of protected expression. We conclude the statute as limited is constitutional and uphold Mireles's conviction.

## II. Prosecutorial Misconduct

Mireles alleges several instances of prosecutorial misconduct. He argues that the prosecutor impermissibly argued at closing that the victim's testimony should be believed because of the hardships she experienced associated with going to trial. He argues that the prosecutor impermissibly, and in violation of a motion in limine, elicited testimony that a previous argument between Mireles and the victim began with the victim refusing to perform a sex act. He asserts that the prosecutor impermissibly argued in closing that Mireles should still "be held accountable" despite SPD's lack of resources to put towards his investigation. He

---

[7] We need look no further than Mireles's own case, which was prosecuted without instructing the jury using the "to embarrass" prong.

argues that the prosecutor impermissibly drew a correlation during closing between Mireles's conduct during the previous argument and his conduct in the text messages. And, in a statement of additional grounds, he argues the prosecutor impermissibly pressured him to take a plea deal and unreasonably delayed in requesting cell phone evidence.

Mireles did not object to any of these instances of prosecutorial misconduct. Therefore, he must show that the misconduct was so flagrant and ill-intentioned that (1) no curative instruction would have obviated any prejudicial effect on the jury, and (2) the resulting prejudice had a substantial likelihood of affecting the jury verdict. State v. Scherf, 192 Wn.2d 350, 398, 429 P.3d 776 (2018).

A.  Refusal to Perform Sex Act

Prior to trial, the trial court granted Mireles's motion in limine to exclude testimony that an earlier argument arose out of the victim's refusal to perform a particular sex act. The trial court ruled the fact of the incident was admissible but that mention of the sex act was not. Mireles argues that the prosecutor impermissibly elicited testimony that the prior argument between Mireles and the victim arose out of the victim's refusal to perform a particular sex act. Mireles argues the following exchange during the victim's testimony violated the pretrial ruling:

> Q:  And how did the incident where he became physically violent with you begin?

A:  He wanted me to do something that I wasn't comfortable doing. And I wanted to explain to him why, and he didn't want me to talk about it because it involved my ex-husband.

The victim never testified that the argument began because she refused to perform a particular sex act. The pretrial motion was therefore not violated, and no impermissible evidence was presented to the jury. Instead, the prosecutor appropriately prepared the witness to give an answer that comported with the court's ruling. No prosecutorial misconduct occurred.

Mireles also argues the prosecutor committed misconduct during closing argument by displaying messages he sent to the victim about having anal sex with her. He argues this was in violation of a pretrial ruling that no dialogue about sex was allowed "to save [the victim] any embarrassment during trial." He provides no record citation to such a ruling. The order on the motions in limine does not reference the text messages. In fact, the PowerPoint presentation utilized in closing had been admitted at trial. Mireles fails to demonstrate use of the text messages was prosecutorial misconduct.

B.  Hardships Associated with Trial

Mireles next argues that the prosecutor impermissibly elicited testimony from the victim relating to the hardships she endured by participating in trial. Mireles objected to this line of questioning at trial:

Q:  . . . How many times have you had to sit for an in-person interview for this case?

A:  Today will be the fourth.

Q:  How much time have you had to take off of work?

[Defense Counsel]: Objection.  Relevance.

THE COURT:  Sustained.

. . . .

Q:  Describe what the process has been like being a witness in this case.

[Defense Counsel]:  Objection.  Relevance.

[Prosecutor]:  Your honor, I think it's relevant for the jury to be able to hear what the process has been.

THE COURT:  I don't.  I'm going to sustain the objection.

In closing arguments, the prosecutor again referenced the victim's experience participating in the case, by saying,

[The victim] has had to come in four times to be interviewed and for trial testimony.  She told you she works full-time and that it's been a financial hardship.  You can tell from her demeanor here in court and her testimony the price that she's paid in terms of personal embarrassment and emotional pain for having to relive all of this.

The victim testified that she had done four in person interviews.  And, while Mireles successfully objected to the question that followed that answer, he never moved to strike any of the victim's testimony.  The facts were in evidence and it was not misconduct to refer to them.  The balance of the statements challenged by Mireles are the prosecutor asking the jury to draw a reasonable inference from the evidence.  This was not misconduct.

C. Lack of SPD Resources

Mireles next argues that the prosecutor's reference to limited resources of police during closing argument invited the jury to decide the case on an emotional

17

basis. He cites State v. Thierry, 190 Wn. App. 680, 691, 360 P.3d 940 (2015), to support the proposition that this was improper. But, that case involved argument that unless the jury believed the child rape victim in that case, there would be no way for the police to prosecute child abuse. Id. at 690-91. The facts here are clearly distinguishable. Mireles cross-examined Detective Christensen as to the adequacy of his investigation. The prosecutor's argument was made in response to a direct attack on the adequacy of the investigation. The prosecutor's comments relating to police resources were brief, comprising only a small fraction of closing. Given the direct attack on the adequacy of the investigation, it was reasonable for the prosecutor to offer some response. This was not misconduct.

### D. Improper Inference

Mireles last takes issue with the prosecutor correlating Mireles's behavior during the prior argument between himself and the victim and the behavior on the text messages. The court allowed admission of the previous incident for the purpose of proving the victim's reasonable fear that Mireles would act on the threats in the text messages. In closing the prosecutor argued the following:

> [The text messages are] authentic because of the content. After this nightmare of threats and harassing messages, Mr. Mireles calms down. He apologizes for the messages the he sent. [The victim] told you this is the same thing that he did in November of 2017 after becoming violent and physically intimidating towards her. He calmed down afterwards. In the days that followed he apologized. He promised he'd change. That's why she stayed with him, because she believed him and she loved him.

18

Mireles argues that this drew an impermissible inference from the evidence and encouraged the jury to utilize the evidence for an improper purpose. He is correct, this was not the limited basis on which the evidence was admitted. However, an instruction to the jury to consider the evidence for only its proper purpose would have cured any prejudice. The jury is presumed to follow its instructions, and a limiting instruction is the usual remedy to ensure that the jury does not consider evidence for an improper purpose. State v. Grigsby, 97 Wn.2d 493, 499, 647 P.2d 6 (1982); ER 105. Absent a showing of prejudice, the error does not justify a new trial.

E. Plea Negotiations

Mireles argues in a statement of additional grounds that the prosecutor impermissibly pressured him to take a plea deal and added the cyberstalking charge in retaliation for his failure to do so. He cites no case law supporting the proposition that attempting to persuade a defendant to take a plea deal constitutes misconduct. And, he does not allege that the prosecutor threatened additional charges if he did not accept the deal. He was represented by counsel throughout any negotiations, but does not supply an affidavit from counsel to support his claim. Rather, he argues the cyberstalking charge was added in retaliation for his refusal after the fact. Prosecutors may not punish the defendant with additional charges for exercising their right to trial. U.S. v. Goodwin, 457 U.S. 368, 372, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982). However, we do not presume a prosecutor's

19

additional charges are vindictive absent any evidence of vindictiveness. Id. at 380-81. Mireles encourages us to do just that, because he offers no evidence of vindictiveness other than the timing of the additional charge. We reject the invitation.

### F. Cell Phone Records

Mireles also takes issue with the late timing of the State's request for the victim's phone records. He says that his attorney was "pleased" that the records "proved I did not message [the victim]." Notwithstanding the fact that the phone records do not prove as much as Mireles claims, it may be true that the substance of the evidence was helpful to Mireles's case. But, he makes no effort to articulate how the late arrival of the evidence prejudiced him. Absent any prejudice, Mireles is unable to sustain a charge of prosecutorial misconduct.

### III. Ineffective Assistance of Counsel

Mireles argues that his trial counsel's failure to object to misconduct described above constituted ineffective assistance of counsel. To sustain a claim of ineffective assistance of counsel, Mireles must show that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by the performance. State v. Estes, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017). Prejudice exists if "'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" Id. at 458 (quoting State

v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Mireles bears the burden of affirmatively proving prejudice. Id.

As noted above, only one of the instances that Mireles alleges are misconduct—encouraging the jury to draw an impermissible inference from the evidence. Declining to object to the other instances cannot be said to fall below an objective standard of reasonableness because such an objection would have been overruled. But, failure to object to the actual instance of misconduct was below the objective standard of reasonableness.

Still, Mireles must also show that but for his counsel's error in failing to object, the result of the trial would have been different. Id. at 458. He has failed to do so here. The prosecutor's statement was insignificant when compared to the remaining evidence. The victim and Mireles were in a romantic relationship. She had a reasonable basis to fear him. The messages were of a threatening nature and about a domestic relationship. The victim testified that Mireles sent the messages and that he was the "Richard" displayed in those messages. A police officer testified that he viewed the text messages on the victim's phone the day after they were sent. The text messages also correspond with the call log, with Mireles reacting to a call from the victim. The victim also testified to how she reacted to the messages. She testified that she was afraid to go home. She asked strangers she encountered near her home to wait for her while she checked the home to ensure it was safe. The jury must have believed this testimony was

credible in order to return a guilty verdict. Mireles fails to show that the exclusion of the improper argument by the prosecutor would have changed this fact.

We reject Mireles's claims of ineffective assistance of counsel.

IV. Sufficiency of the Evidence

Sufficiency of the evidence is a question of constitutional law we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The State is required to prove all elements of the charged offense beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Evidence is sufficient to support a conviction if "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)), abrogated on other grounds by Washington v. Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006).

The State introduced the text messages wherein Mireles threatens violence, tells her he is waiting at her home, threatens to "ruin her job" by sharing messages with co-workers, makes demeaning comments about having anal sex with her, threatens to kill her, and threatens to kill himself. The victim testified to receiving the messages. A police officer testified that the text messages were from Mireles. When a defendant challenges the sufficiency of the evidence, they admit

the truth of all the state's evidence. State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). Viewing this evidence in the light most favorable to the State, a rational trier of fact could have found that Mireles sent text messages threatening to injure the victim with the intent to harass, intimidate, or torment her beyond a reasonable doubt. The evidence is sufficient to support his conviction.

We reject Mireles's challenge to the sufficiency of the evidence.

## V. Cumulative Error

Mireles last argues that cumulative error deprived him of his right to a fair trial. The cumulative error doctrine applies when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny the defendant a fair trial. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because we find that only one error occurred, the doctrine is inapplicable here.

We strike the term "embarrass" from RCW 9.61.260. We affirm Mireles's conviction under the statute.

Appelwick, J.

WE CONCUR: