# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54086-0-II |
| Respondent, | |
| v. | |
| DAVID MICHAEL FORD, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — David Ford was convicted of two counts of felony cyberstalking and one count of extortion with sexual motivation, and the trial court imposed an exceptional sentence. He appeals his two convictions for felony cyberstalking, arguing that (1) the cyberstalking statute is unconstitutionally overbroad. He also appeals his sentence, arguing that (2) restriction of internet use violates his free speech rights, (3) the exceptional sentence is unsupported by law, (4) the sentencing condition that he obtain a psychosexual evaluation is not authorized by statute, and (5) legal financial obligations (LFOs) were erroneously imposed. The State concedes that Ford's convictions for cyberstalking should be reversed.

We accept the State's concession that Ford's conviction for cyberstalking must be reversed. We further hold that the trial court did not err in imposing community custody conditions limiting access to telecommunications technology, including the internet, and requiring Ford to undergo a psychosexual evaluation and treatment. We do not consider Ford's other arguments. We reverse Ford's convictions for cyberstalking and remand for resentencing.

FACTS

In September 2018, Christina Nieland had temporarily separated from her husband and was living with a friend at her friend's home where David Ford was also residing. During this time, Nieland and Ford had a brief sexual relationship after which Nieland told Ford that she wanted to end their relationship and reconcile with her husband. Ford reacted very angrily and began obsessively calling and messaging Nieland by phone and social media. At one point, Ford called Nieland ten times repeatedly until she answered.

Nieland told Ford to stop, but Ford persisted. Nieland blocked Ford's phone number, but Ford continued to reach Nieland through various social media accounts and other phone numbers until she relented and unblocked him. Ford demanded that Nieland send him sexually explicit photographs and videos of herself. Ford threatened to reveal their sexual relationship to Nieland's husband if Nieland did not comply with Ford's demands. Afraid that Ford would carry out his threats, Nieland complied.

Eventually, Nieland contacted law enforcement to report Ford's behavior. That same day, Ford threatened to send an explicit video of Ford and Nieland having sex to Nieland's teenage stepdaughter. Ford then carried through with that threat by contacting the stepdaughter through social media, telling her that her stepmother and father were going to get a divorce, and sending her sexually explicit pictures and videos of Nieland.

54086-0-II

The State arrested Ford and charged him with one count of second-degree extortion with a sexual motivation[1] and two counts of cyberstalking.[2] The matter proceeded to a jury trial.

The jury instructions defined cyberstalking as follows:

A person commits the crime of cyberstalking when, with intent to harass, intimidate, or embarrass another, he or she makes an electronic communication using lewd, lascivious, indecent, or obscene words, images, or language; or suggesting the commission of any lewd or lascivious act; or repeatedly; whether or not a conversation occurs and the person had previously been convicted of the crime No Contact/Protection Order Violations against a person who was specifically named in a no-contact order.

Clerk's Papers (CP) at 47.

The jury was also instructed that to convict Ford of cyberstalking, five elements must be proved beyond a reasonable doubt:

(1) That on, about, or between October 1, 2018, and October 31, 2018, the defendant made an electronic communication to Veronica Nieland;
(2) That at the time the defendant made the electronic communication the defendant intended to harass, intimidate, torment, or embarrass any other person;
(3) That the defendant:
    a) used lewd, indecent, lascivious, or obscene words, images, or language in the electronic communication;
    b) suggested the commission of any lewd or lascivious act in the electronic communication; or
    c) made an electronic communication repeatedly, whether or not a conversation occurred;
(4) That the defendant was previously convicted of the crime No Contact/Protection Order Violations against a person who was specifically named in a no-contact order; and
(5) That the electronic communication was made or received in the State of Washington.

CP at 49-52.

---

[1] RCW 9A.56.130.

[2] RCW 9.61.260.

3

The verdict form simply asked the jury to find Ford guilty or not guilty of cyberstalking without specifying upon which subsection—3(a), (b), or (c)—it had based its decision. The jury found Ford guilty on all three counts. The court ordered that a pre-sentencing investigation report (PSI) be prepared.

Ford's PSI recounted that in 2012, Ford had repeatedly contacted minor girls using social media, and then pressured or enticed them to send him sexually explicit pictures and videos of themselves. When the victims sent pictures or videos, Ford threatened to send the materials to the girls' friends and family unless they complied with his demands to produce and send more sexually explicit materials to him. Based on this behavior, Ford was charged with 25 counts involving seven victims, but pleaded guilty to only one count of second degree extortion and one count of sexual exploitation of a minor. Ford was sentenced to 48 months in prison on that charge. Ford's PSI concluded that Ford's sexual deviancy, accelerating criminal activity, and possible mental health issues increased his risk to reoffend.

The trial court sentenced Ford to an exceptional sentence of 69 months based on the free crimes aggravator,[3] running the extortion count consecutively with the two cyberstalking counts. Ford was also sentenced to 36 months of community custody. The court imposed community custody conditions that included prohibitions against the use of telecommunications technology:

> 24. No internet access or use without prior approval of the supervising CCO, Treatment Provider, and the Court.
>
> 25. No use of a computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes (including job searches). The CCO is permitted to make random searches of any computer, phone or computer-related device to which the defendant has access to

---

[3] RCW 9.94A.535(2)(c).

monitor compliance with this condition. Also, do not access any social media sites (Facebook, Twitter, Snapchat, etc.) of any kind.

CP at 85

The trial court also imposed a community custody condition that Ford obtain a psychosexual evaluation and treatment. During the hearing, the court stated that a psychosexual evaluation was "essentially a mental health evaluation," but it did not impose a mental health evaluation as a condition of Ford's community custody. 8 Report of Proceedings (RP) (Dec, 6, 2019) at 38. The court found Ford was indigent and imposed a non-discretionary victim assessment fee of $500. However, the final judgment and sentence contained boiler plate language regarding payment of other fines and fees:

> COLLECTION COSTS The defendant shall pay the costs of services to collect unpaid legal financial obligations per contract or statute. RCW 36.18.190, 9.94A.780 and 19.16.500.
> . . . .
>
> While on community placement or community custody, the defendant shall: . . . (7) pay supervision fees as determined by DOC.

CP at 93, 96.

Ford appeals his convictions for cyberstalking, his exceptional sentence, the conditions of his community custody, and imposition of supervision fees and collection costs.

ANALYSIS

Ford makes five arguments. He argues that (1) his cyberstalking convictions must be reversed because the statute is unconstitutionally overbroad. He further argues that the trial court erred by (2) imposing internet-related conditions of community custody in violation of his free speech rights under the First Amendment; (3) imposing an exceptional sentence under the free crimes aggravator because the cyberstalking offenses were, in fact, punished; (4) ordering a

5

psychosexual evaluation and treatment as a condition of community custody because Ford was not found to have a statutorily defined mental illness; and (5) imposing discretionary LFOs of collection costs and supervision fees.

We agree that Ford's convictions for cyberstalking must be reversed. We further hold that the trial court did not err in imposing the community custody provisions. We do not consider Ford's arguments regarding the LFOs, because the trial court can reconsider them at resentencing.

## I. CONSTITUTIONALITY OF RCW 9.961.260(1)(b)

Ford argues that RCW 9.61.260(1)(b), one of the prongs of the cyberstalking statute by which he was convicted, is overbroad. He argues that his convictions for felony cyberstalking must be reversed because the State cannot prove beyond a reasonable doubt that the inclusion of an unconstitutional prong in his to-convict jury instruction for cyberstalking did not prejudice him.

The State concedes that Ford's cyberstalking convictions must be reversed because RCW 9.61.260(1)(b) was held to be unconstitutional in *Rynearson v. Ferguson*, 355 F. Supp. 3d 964, 972 (W.D. Wash. 2019). The State also relies on an unpublished case from Division One of this court that followed *Rynearson* to accept the State's concession on the same grounds.[4] We accept the State's concession that Ford's cyberstalking convictions must be reversed.

---

[4] *Slotemaker v. State*, No. 78665-2-I, 2019 WL 3083302 (Wash. Ct. App. July 15, 2019) https://www.courts.wa.gov/opinions/pdf/786652.pdf.

Free speech rights are protected by both the Washington and federal constitutions. WASH. CONST. art. I, § 5; U.S. CONST. amend. I. We review the constitutionality of statutes de novo. *State v. Immelt*, 173 Wn.2d 1, 6, 267 P.3d 305 (2011). We analyze an overbreadth argument under article I, section 5 the same as under the First Amendment. *Immelt*, 173 Wn.2d at 6.

A.      *Overbreadth*

A statute is unconstitutionally overbroad if it prohibits a substantial amount of protected speech, and no means exist by which to sever its unconstitutional application. *State v. Gray*, 189 Wn.2d 334, 345, 402 P.3d 254 (2017); *State v. Alphonse*, 147 Wn. App. 891, 903, 197 P.3d 1211 (2008). "A statute or ordinance will be overturned only if the court is unable to place a sufficiently limiting construction on a standardless sweep of legislation." *City of Tacoma v. Luvene*, 118 Wn.2d 826, 840, 827 P.2d 1374 (1992). Federal courts cannot supply limiting constructions on a state statute unless the statute is "'readily susceptible' to such a construction." *United States v. Stevens*, 559 U.S. 460, 481, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010). This is because federal courts "lack jurisdiction authoritatively to construe state legislation." *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 369, 91 S. Ct. 1400, 28 L. Ed. 2d 822 (1971).

To prevail in a facial challenge based on the First Amendment, Ford must either demonstrate that "no set of circumstances exists under which [the statute] would be valid," or that "a substantial number of its applications are unconstitutional, judged in relation to the statue's plainly legitimate sweep." *Stevens*, 559 U.S. at 472-73 (internal quotation marks

omitted). Courts generally first examine the statute to determine whether it reaches a substantial amount of protected speech. *State v. Williams*, 144 Wn.2d 197, 206, 26 P.3d 890 (2001).

If the challenged statute touches upon constitutionally protected speech in a constitutionally impermissible manner, we may turn to whether it is possible to limit the statute's construction or apply severance in order to save its constitutionality. *City of Seattle v. Huff*, 111 Wn.2d 923, 923, 767 P.2d 572 (1989).

> The criminal cyberstalking statute provides in relevant part:
>
> (1) A person is guilty of cyberstalking if he or she, with intent to harass, intimidate, torment, or embarrass any other person, and under circumstances not constituting telephone harassment, makes an electronic communication to such other person or a third party:
>
> (a) Using any lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act;
>
> (b) Anonymously or repeatedly whether or not conversation occurs; or
>
> (c) Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.
>
> . . . .
>
> (5) For the purposes of this section, "electronic communication" means the transmission of information by wire, radio, optical cable, electromagnetic, or other similar means. "Electronic communication" includes, but is not limited to, electronic mail, internet-based communications, pager service, and electronic text messaging.

RCW 9.61.260.

We note that the cyberstalking statute is almost identical to the relevant language found in the criminal telephone harassment statute:

> (1) Every person who, with intent to harass, intimidate, torment, or embarrass any other person, shall make a telephone call to such other person:

(a) Using any lewd, lascivious, profane, indecent, or obscene words or language, or suggesting the commission of any lewd or lascivious act; or

(b) Anonymously or repeatedly or at an extremely inconvenient hour, whether or not conversation ensues; or

(c) Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.]

RCW 9.61.230.[5]

The statute criminalizing telephone harassment has survived numerous constitutional challenges for overbreadth in Washington courts, with courts holding that the telephone harassment statute regulates conduct, not speech. *State v. Dyson*, 74 Wn. App. 237, 243-46, 872 P.2d 1115 (1994); *State v. Alexander*, 76 Wn. App. 830, 832, 888 P.2d 175 (1995). The telephone harassment statute also passed constitutional muster in *United States v. Waggy*, 936 F.3d 1014, 1015 (9th Cir. 2019) for the same reason.

However, the criminal cyberstalking statute, unlike the telephone harassment statute, regulates more than conduct. The statute, by regulating electronic communications, regulates the posting of content on public web pages and social media sites. Thus, the statute prohibits a substantial amount of protected speech.[6] Because of this, the district court in *Rynearson* held that subsection (1)(b) of the cyberstalking statute violated the First Amendment because it targeted speech and could not survive strict scrutiny. *Rynearson*, 355 F. Supp. 3d at 972.

---

[5] Moreover, the penalties are the same.

[6] This is so because of the definition of "electronic communication" together with the phrase "under circumstances not constituting telephone harassment." RCW 9.61.260.

In *Rynearson*, the court granted injunctive relief against the State from enforcing RCW 9.61.260. *Rynearson*, 355 F. Supp. 3d at 972. Rynearson was an activist and author who used social media and the internet to criticize public figures and government officials. *Rynearson*, 355 F. Supp. 3d at 967. Rynearson's posts regularly included "invective, ridicule, and harsh language" calling on public officials to be removed from office and highlighting their questionable actions and motives. *Rynearson*, 355 F. Supp. 3d at 967. Public officials sought and obtained a civil protection order against Rynearson for some of his online activity and social media posts criticizing a local leader; Rynearson sought injunctive relief to prevent his prosecution for violating the order. *Rynearson*, 355 F. Supp. 3d at 968.

The *Rynearson* court held that RCW 9.61.260(1)(b) violated the First Amendment based on a plain reading of the statute, not the narrow construction of terms imported from our telephone harassment jurisprudence. *Rynearson*, 355 F. Supp. 3d at 969-70 ("Section 9.61.260(1)(b)'s breadth—by the plain meaning of its words—includes protected speech that is not exempted from protection by any of the recognized areas just described . . . The opportunity for repeating this 'plain meaning' view of the statute to criminalize protected speech calls out for a prompt curative response."). *Rynearson* focused on the "with intent to . . . embarrass" portion of the statute. *Rynearson*, 355 F. Supp. 3d at 972 ("*Anonymous* speech uttered or typed with the intent to *embarrass* a person as here, is protected speech. The plain meaning of the italicized words render 9.61.260(1)(b) unconstitutional."). *Rynearson* reasoned that anonymous online speech intended to merely embarrass might sweep up and criminalize public debate and other critical discourse touching on matters of political, religious, or public concern that have been

10

historically sacred components of free speech in the United States. *Rynearson*, 355 F. Supp. 3d at 971.

Here, the State simply concedes that Ford's cyberstalking convictions must be reversed based on *Rynearson*. The State offers no argument as to how this court could narrowly construe the statute, nor does the State suggest any narrow construction that could sufficiently limit application of the cyberstalking statute. Because the State offers no such argument, and the parties have briefed no such scenario, we accept the State's concession that RCW 9.61.260(1)(b) is unconstitutional under *Rynearson*.

We hold that RCW 9.61.260(1)(b) is not narrowly tailored because its reach is substantially broader than necessary to achieve the government's goal of preventing cyberstalking. This is because the challenged statute would sweep up a vast array of otherwise protected speech simply because it is made anonymously or repeatedly. Further, because all "internet-based communications" are within its sweep, the challenged statute does not leave open ample alternative channels of communication.

B. *Reversible Error*

Because we accept the State's concession that RCW 9.61.260(1)(b) is unconstitutional, we also presume that Ford was prejudiced. *State v. Williams*, 144 Wn.2d 197, 213, 26 P.3d 890 (2001). The State can overcome the presumption of prejudice if it can show beyond a reasonable doubt that the jury would have reached the same result without the error. *Williams*, 144 Wn.2d at 213.

Here, the jury was instructed that it could find Ford guilty of criminal cyberstalking if "at the time the defendant made the electronic communication the defendant intended to harass,

intimidate, torment, *or* embarrass any other person." (Emphasis added.) CP at 49. Because the instruction uses the disjunctive "or," and because the verdict form did not specify on what basis of intent the jury convicts, there is no way to prove on what basis the jury found Ford guilty. The State also concedes that it is unable to prove that the error is harmless. As a result, we reverse Ford's convictions for cyberstalking.

## II. COMMUNITY CUSTODY CONDITIONS

We address two community custody condition issues that may arise at the resentencing.

A.      *Limited Use of Telecommunication Technology as Condition of Community Custody*

Ford argues that the conditions of his community custody regarding his use of and access to telecommunications technology, specifically access to the internet, infringe on his First Amendment rights because they are overbroad. We disagree.[7]

Courts may impose "crime-related prohibitions" as conditions to a sentence. RCW 9.94A.505(9). But conditions that interfere with fundamental rights must be sensitively imposed so that they are reasonably necessary to accomplish the essential needs of the State and public order. *In Re Pers. Restraint Pet. of Rainey*, 168 Wn.2d 367, 377, 229 P.3d 686 (2010). Generally, conditions imposed at sentencing are reviewed for abuse of discretion because "the imposition of crime-related prohibitions is necessarily fact-specific and based upon the sentencing judge's in-person appraisal of the trial and the offender." *Rainey*, 168 Wn.2d at 374-75. Conditions that are unconstitutional are necessarily an abuse of discretion. *State v. Padilla*,

---

[7] Ford makes no argument that the condition that he obtain permission before accessing the internet is unconstitutionally vague.

190 Wn.2d 672, 677, 416 P.3d 712 (2018). A regulation implicating First Amendment rights must be "narrowly tailored to further the State's legitimate interest." *Padilla*, 190 Wn.2d at 678.

In *State v. Johnson*, 197 Wn.2d 740, 487 P.3d 893 (2021), our Supreme Court considered a community custody provision that provided that Johnson "not use or access the World Wide Web unless specifically authorized by [his community custody officer] through approved filters." *Johnson*, 197 Wn.2d at 744. The court concluded that the limitation on Johnson's future internet use was not overbroad. *Johnson*, 197 Wn.2d at 747. In doing so, the Supreme Court recognized that "[w]hile requiring Johnson to use an overzealous filter might violate the First Amendment, that is a question of appropriate enforcement and a question for another day." *Johnson*, 197 Wn.2d 746-47.

Ford cites to *Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730, 198 L. Ed. 2d 273 (2017), to support his argument. In *Packingham*, a registered sex offender who did not necessarily use the internet to perpetrate his crimes was completely banned from internet-based activities. *Packingham*, 137 S. Ct. at 1737. Packingham challenged a North Carolina law making it a felony for sex offenders "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." *Packingham*, 137 S. Ct. at 1731. The Supreme Court held that the State had not met its burden to show the law was necessary or that the law legitimately served that purpose. *Packingham*, 137 S.Ct. at 1732-33. But here, unlike in *Packingham*, Ford has repeatedly used the internet to commit crimes, and Ford is not completely banned from internet-based activities.

*In Re Pers. Restraint of Sickles*, 14 Wn.App.2d 51, 469 P.3d 322 (2020), a case cited by Ford, Division Three of this court held that "[d]elegating authority to [defendant's] supervising CCO to approve internet access does not solve the problem" of what it deemed was an unconstitutionally overbroad prohibition to internet access. *Sickles*, 14 Wn. App. 2d at 73. The language from Sickels' conditions were practically identical to those at issue here. Sickels was convicted of second-degree attempted rape of a child after he solicited an undercover officer posing as a 13-year-old girl on a popular internet classifieds website. *Sickles*, 14 Wn. App. 2d at 57-58.

But the *Sickles* decision is based on *State v. Sansone*, 127 Wn. App. 630, 641-43, 111 P.3d 1251 (2005), which was decided on vagueness grounds, not overbreadth. Moreover, Division Three expressly limited its holding to "the circumstances at hand," reasoning that delegation was not improper if the prohibitions were "not necessarily static" and left to the more objective discretion. *Sansone*, 127 Wn. App. at 643. We decline to follow *Sickels*.

Here, Ford's use of the internet is conditioned by two criteria: it must be for "employment purposes (including job searches)," or he must receive "prior approval of the supervising CCO, Treatment Provider, and the Court." CP at 106. Unlike *Packingham*, Ford's conditions are not absolute because he can still access the internet with requisite permission. Like *Johnson*, Ford is "subject to a partial deprivation of his interest in having access to the Internet after he committed crimes through that medium." *State v. Johnson*, 12 Wn. App. 2d 201, 215, 460 P.3d 1091 (2020), *aff'd*, 197 Wn.2d 740 (2021). Ford's conditions are "crime-related prohibitions" that are reasonably necessary to prevent repeat offense.

14

We hold that the conditions for Ford's limited use of telecommunications technology, including the internet, are reasonably necessary to accomplish the essential needs of the State, and are therefore not unconstitutionally overbroad.

B.      *Psychosexual Evaluation and Treatment*

Ford argues that the court erred in ordering a psychosexual evaluation and treatment as a condition of his community custody.  We disagree.

Ford and the State disagree on the statutory authority for the court-ordered psychosexual evaluation.  Ford argues that the evaluation is a mental health evaluation under RCW 71.24.025, and that the trial court erred because it did not make a specific finding that he was mentally ill.[8] The State argues that Ford's psychosexual evaluation is included in treatment covered by RCW 9.94A.703(3)(c), which allows the trial court to condition a defendant's community custody on his "[participation] in crime-related treatment or counseling services."  We agree with the State.

A trial court lacks authority to order a mental health evaluation and treatment as a condition of community custody unless it finds that (1) reasonable grounds exist to believe that a person is mentally ill, and (2) this condition most likely influenced the offense.  *State v. Brooks*, 142 Wn. App. 842, 851–52, 176 P.3d 549 (2008); RCW 9.94A.505(9).  A person is "mentally ill" when they are "acutely mentally ill," "chronically mentally ill," a "seriously disturbed person," or a "severely emotionally disturbed child."  Former RCW 71.24.025(1), (10), (28), (36), (37) (2018).  A "mental disorder" means "any organic, mental, or emotional impairment

---

[8] Ford bases his argument on the court's statement at sentencing that the psychosexual evaluation was "essentially a mental health evaluation."  8 RP at 38.

which has substantial adverse effects on a person's cognitive or volitional functions." Former RCW 71.05.020(36) (2018). The term "sexual deviancy" does not appear among these definitions. Therefore, on this record the trial court was not authorized to order a mental health evaluation.

However, the psychosexual evaluation is not a mental health evaluation, it is a sexual deviancy evaluation. Sexual deviancy evaluations and treatment are crime-related conditions for sex offenses. *See In Re Pers. Restraint of Brettell*, 6 Wn. App. 2d 161, 174, 430 P.3d 677 (2018) (upholding community custody condition requiring defendant be evaluated and follow the recommended course of treatment of a certified sexual deviancy counselor); RCW 9.94A.030(47)(c).

Here, because Ford was convicted of a sex offense, the psychosexual evaluation is a crime-related evaluation, permissible under RCW 9.94A.703(3)(c) as part of Ford's conditions of community custody. The court's oral ruling opining on the similarity of the two types of evaluations does not transform one into the other.

We hold that the trial court did not err in ordering Ford undergo a psychosexual evaluation and treatment.

## CONCLUSION

We accept the State's concession that Ford's convictions for cyberstalking must be reversed. We hold that the trial court did not err when it imposed limitations to Ford's use of telecommunications technology, including the internet, or a psychosexual evaluation and

16

treatment as conditions of his community custody.[9]  We reverse Ford's cyberstalking convictions and remand to the trial court to vacate those convictions and resentence Ford.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

I concur:

Lee, C.J.

I concur in result only:

Cruser, J.

---

[9] We decline to resolve the issues of Ford's exceptional sentence or the court's imposition of discretionary costs because the trial court can address these issues at resentencing.